**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| **v.** : | |
| : | **Action No. 2:04cr227** |
| **MICHAEL IBANGA,** : | |
| : | |
| **Defendant.** : | |
| _____ : | |

**OPINION**

After an eleven-day trial, a jury acquitted defendant
Michael Ibanga of all of the drug distribution charges against
him and one of the two money laundering charges against him in
the Indictment.  The single count of which defendant Ibanga was
convicted typically would result in a Guidelines custody range of
51 to 63 months.  However, the United States demanded that the
Court sentence defendant Ibanga based on the alleged drug dealing
for which he was acquitted.  This increased the Guidelines
custody range to 151 to 188 months, a difference of about ten
years.

Although the Sentencing Guidelines require that district
courts include acquitted conduct under certain circumstances when
calculating a custody range, U.S. Sentencing Guidelines Manual §
1B1.3, comment. (backg'd.) (Nov. 2005) [hereinafter USSG § ___],
the Court declined to sentence defendant Ibanga on this basis.

Sentencing a defendant to an extra ten years in prison for a crime of which he was acquitted is constitutionally questionable and would not serve the statutory sentencing factors set forth in 18 U.S.C. § 3553(a).  The Court therefore sentenced defendant Ibanga to 55 months in prison, a term of incarceration that would have fallen in the middle of the Guidelines range had the acquitted conduct not been included in the calculations.  This opinion explains the Court's reasoning.

## I.  <u>FACTUAL AND PROCEDURAL HISTORY</u>

By Superseding Indictment handed up on January 27, 2005, a Grand Jury sitting in the Eastern District of Virginia charged defendant Michael Ibanga with one count of conspiracy to distribute 50 grams or more of methamphetamine (Count 1) and three counts of distribution of methamphetamine (Counts 28, 36 and 48).  The Grand Jury further charged defendant Ibanga with conspiracy to launder money (Count 2) and one count of actual money laundering (Count 19).

Defendant Ibanga was not caught with a substantial quantity of drugs.  Instead, the evidence of drug dealing introduced against him at trial consisted principally of testimony from the following witnesses:

- **Gilberto Dolot Calceta** testified that he received 200 to 300 grams of methamphetamine "ice" from defendant Ibanga every week or two for several months in an unspecified year.

- **Eugene Valasco Galaty** testified that he purchased 4 grams of methamphetamine "ice" from defendant Ibanga in March 2002.  Galaty further testified that he traveled from Virginia to New Jersey with defendant Ibanga in February 2002.  They stayed at the house of defendant Ibanga's father, Isaganni Ibanga.  During their stay, Isaganni received a large shipment of methamphetamine "ice" from California.  Defendant Ibanga rode with his father and Galaty as they transported the "ice" from New Jersey back to Virginia Beach.

  Galaty further testified that he accompanied defendant Ibanga once when he picked up $2,600 from Gilberto Calceta and delivered it to Isaganni.  Galaty also testified that he, Joseph Javier and defendant Ibanga were transporting 44 grams of methamphetamine "ice" from New Jersey to Virginia Beach on March 18, 2002 when they were stopped by a Chesapeake Bay Bridge Tunnel police officer.  The "ice" was located in a shaving cream can with a false bottom.  A small amount

of suspected "ice" was found on defendant Ibanga's person, but it was never tested.

- **Joseph Cayanan Javier** testified that he purchased methamphetamine "ice" from defendant Ibanga on three separate occasions. Javier later became defendant Ibanga's driver. On one occasion, Javier drove defendant Ibanga to collect a large sum of money from Gilberto Calceta. Defendant Ibanga then delivered the collected funds to Isaganni. On another occasion, Javier accompanied defendant Ibanga to a grocery store where they wired funds to California to pay for methamphetamine "ice." Isaganni supplied the money that they wired. Finally, Javier confirmed Galaty's account of the March 18, 2002 stop at the Chesapeake Bay Bridge Tunnel.

- **Eric Andres** testified that he and defendant Ibanga made two or three trips from New York to Virginia to transport methamphetamine "ice."

- **Remie Varias** testified he received at his house at least three times each month a package containing one-half to one kilogram of methamphetamine "ice." The packages were sent from California, and he received them on behalf of defendant Ibanga. Varias further testified that he acted as gofer for both defendant

Ibanga and Isaganni.  In this role, Varias delivered methamphetamine "ice" and wired drug proceeds for both men.

- **John Gelardi** testified that he purchased at least 74 grams of methamphetamine "ice" from defendant Ibanga. A substantial amount of this "ice" was recovered from Gelardi's house when he was arrested.  Gelardi further testified about a conversation he had with defendant Ibanga during which Ibanga admitted owing 50 grams of pink methamphetamine "ice" that police found in the glove compartment of a car located at a murder scene. A .45 caliber pistol was located under the driver's seat of the car.

Each of these witnesses either testified under a grant of immunity or freely admitted that they were cooperating with the government in the hope of receiving a sentence reduction pursuant to Fed. R. Crim. P. 35.

As noted above, the jury necessarily rejected the testimony of these witnesses because it found defendant Ibanga guilty only of the charge of conspiracy to launder money (Count 2).  The Court thereafter entered a Sentencing Procedures Order (Docket No. 111) and released defendant Ibanga on bond pending sentencing (Docket No. 117).

A.     **The Pre-Sentence Report**


As required by Federal Rule of Criminal Procedure 32, the Probation Office of the Court prepared a Presentence Investigation Report ("PSR").  The Probation Office initially calculated defendant Ibanga's Offense Level as a 45 and his Criminal History as a Category II.  This produced a Guidelines custody range of life in prison.  Since the offense for which defendant Ibanga was convicted (18 U.S.C. § 1956) has a 20-year statutory maximum, 20 years became the recommended sentence.

The Probation Office calculated such a high custody range principally by asserting that defendant Ibanga had distributed 7.68 kilograms of methamphetamine. (PSR ¶ 44).  These are, of course, the same allegations of drug distribution charged in Counts 1, 2, 8, 36 and 48 of the Superceding Indictment and rejected by the jury.  The Probation Office relied on the evidence introduced at trial as proof of Ibanga's drug dealing.

Not surprisingly, the United States did not object to the Presentence Report as prepared by the Probation Office. Defendant Ibanga timely objected,[1] _inter_ _alia_, to the Probation

---

[1]Defendant Ibanga also objected to the amount of laundered funds attributed to him, a gun enhancement, a supervisor enhancement, and to his Criminal History Category.

The Probation Office attributed $736,776.95 in laundered funds to defendant Ibanga.  This sum represented all funds either wired or received by anyone affiliated with the money laundering conspiracy.  Because most of these wires were not "reasonably

Office calculating his sentence based on the alleged drug trafficking for which he had been acquitted.  To resolve defendant Ibanga's objection in accordance with Guidelines procedure, the Court had to make findings of fact concerning defendant Ibanga's alleged drug dealing.  This task required that the Court determine for itself (without deference to the jury's verdict) the weight of the evidence and apply a preponderance of the evidence standard in doing so.  Because the Court's factual determination would be made in the context of sentencing, the Court was entitled to entertain and rely upon evidence that otherwise would have been barred at trial by the Federal Rules of Evidence.  USSG § 6A1.3, comment.

## B.   **Findings of Fact**

In making its findings of fact, the Court considered all of the testimony and evidence received at trial, as well as evidence introduced during defendant Ibanga's multi-day sentencing hearing.  The Court concluded that the only credible witness who gave believable testimony of defendant Ibanga's drug dealing was

---

foreseeable" to defendant Ibanga, USSG § 1B1.3(a)(1)(B), the Court partially sustained the objection and reduced the attributed funds to those wires that defendant Ibanga either sent or received ($85,564).
    Pursuant to USSG § 4A1.3(b)(1), the court reduced defendant Ibanga's Criminal History Category from a II to a I.  The Court sustained his objections to the supervisor and gun enhancements.

John Gelardi.  Based on his testimony, the Court found by a preponderance of the evidence that defendant Ibanga was responsible for distributing 124.03 grams of methamphetamine "ice."

Having found by a preponderance of the evidence that defendant Ibanga sold some amount of drugs, the Court became obligated to apply the drug distribution guidelines (USSG § 2D1.1) rather than the money laundering guidelines ordinarily applicable to a money laundering conviction (USSG § 2S1.1).  This calculation resulted in a custody range of 151 to 188 months.

## II.  **ANALYSIS**

### A.   **Constitutionality of Sentencing a Defendant Based on Acquitted Conduct**

Relevant conduct is the "cornerstone" of the Sentencing Guidelines.  <u>See</u> William W. Wilkins, Jr. & John R. Steer, <u>Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines</u>, 41 S.C. L. Rev. 495, 496 (1990).  The district court's decision about what to include (or not include) as relevant conduct drives the length of a defendant's sentence--the more crimes or bad acts labeled as relevant conduct, the greater a defendant's offense level; the higher the offense level, the greater the sentence.

The conduct considered in calculating a defendant's offense level automatically includes the crime(s) of which the defendant was convicted.  USSG § 1B1.2(a).  The Guidelines also require the district court to include as relevant conduct certain improper actions (such as use of a firearm) upon which the jury never ruled.  USSG § 1B1.3.  The improper actions included as relevant conduct encompass alleged crimes for which the defendant was never charged as well as alleged crimes for which charges were dropped.  Id. § 1B1.3, comment. (backg'd.).  To designate such items as relevant conduct, the district court need only find by a preponderance of the evidence (rather than beyond a reasonable doubt) that the wrongful acts occurred.  Id. § 6A1.3, comment.  The district court can base its findings of fact on inadmissible evidence, such as hearsay.  Id.

In addition to requiring that a district court factor into its calculations uncharged and dismissed crimes, the Guidelines even require that the district court base the defendant's sentence on conduct for which a jury acquitted him at trial.  USSG § 1B1.3, comment. (backg'd.).  The relevant language in the Guidelines states,

> Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range. . . . Relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach.

Id. (emphasis added).

So long as the district court finds by a preponderance of, perhaps inadmissible, evidence that the defendant really committed the crime for which the jury acquitted him, his sentence is increased accordingly.   Id. § 1B1.3; see also, e.g., United States v. Pimental, 367 F. Supp. 2d 143, 146-47 (D. Mass. 2005) (discussing the use of acquitted conduct in Guidelines Calculations).

Sentencing a defendant to time in prison for a crime that the jury found he did not commit is a Kafka-esque result.[2] However, the Supreme Court held in United States v. Watts, 519 U.S. 148, 157 (1997), that this result does not violate the Double Jeopardy Clause of the Fifth Amendment to the Constitution.   Lower appellate courts have uniformly rejected other constitutional challenges to enhancing a sentence based on acquitted conduct.   See, e.g., United States v. Milton, 27 F.3d 203, 208-09 (6th. Cir. 1994) (Fifth Amendment Due Process and Sixth Amendment Right to Trial by Jury); United States v. Boney,

---

[2]In his novel, The Trial, Franz Kafka described a totalitarian state in which the judicial system was used to suppress freedom.  One of the techniques used by the state was non-final "acquittals."  Kafka describes these "acquittals" as follows: "That is to say, when [the accused] is acquitted in this fashion the charge is lifted from [his] shoulders for the time being, but it continues to hover above [him] and can, as soon as an order comes from on high, be laid upon [him] again."  Franz Kafka, The Trial 158 (Willa & Edwin Muir, trans., Alfred A. Knopf, rev. ed. 1992).

977 F.2d 624, 635-36 (D.C. Cir. 1992) (Fifth Amendment Due Process and Double Jeopardy); United States v. Mocciola, 891 F.2d 13, 16 (1st Cir. 1989) (same); United States v. Isom, 886 F.2d 736, 738 (4th Cir. 1989) (Due Process); United States v. Bernard, 757 F.2d 1439, 1444 (4th Cir. 1985) (same).

The continued validity of Watts and its progeny recently was called into question by the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005).  The Court held in Booker that a Guidelines sentence violates the Sixth Amendment to the United States Constitution when the sentencing judge makes findings of fact that result in a sentence higher than the statutorily prescribed maximum.  Id. at 244.  To remedy this constitutional infirmity, the Court excised 18 U.S.C. § 3553(b)(1) from the sentencing statute to make the Guidelines "advisory."  Id. at 259.  Under this regimen, district courts continue to calculate the Sentencing Guidelines as before, but thereafter may vary upward or downward as is necessary to comply with the sentencing factors set forth in 18 U.S.C. § 3553(a). United States v. Green, 436 F.3d 449, 456 (4th Cir. 2006). Sentences imposed by the district courts are reviewed for reasonableness as long as they fall within the statutory range. Booker, 543 U.S. at 261.

Although Justice Stevens's constitutional majority opinion in Booker expressly questioned the continuing validity of Watts,[3] Booker, 543 U.S. at 251, subsequent appellate cases have relied on the supposedly "advisory" nature of the Guidelines to hold that enhancing a defendant's sentence for acquitted conduct remains constitutional.  See, e.g., United States v. Dorcely, 454 F.3d 366, 372 (D.C. Cir. 2006); United States v. High Elk, 442 F.3d 622, 626 (8th Cir. 2006); United States v. Vaughn, 430 F.3d 518, 526 (2d Cir. 2005); United States v. Price, 418 F.3d 771, 787-88 (7th Cir. 2005); United States v. Magallanez, 408 F.3d 672, 684-85 (10th Cir. 2005); United States V. Duncan, 400 F.3d 1297, 1303-04 (11th Cir. 2005).  A number of district courts have reached precisely the opposite conclusion.  See, e.g., United States v. Kandirakis, 441 F. Supp. 2d 282, 2006 U.S. Dist. LEXIS 53243, at *112-132 (D. Mass. Aug. 8, 2006) (submitting all enhancement facts, including acquitted conduct, to an advisory jury at sentencing); United States v. Pimental, 367 F. Supp. 2d 143, 150 (D. Mass. 2005) ("It makes absolutely no sense to conclude that the Sixth Amendment is violated whenever facts

---

[3] Justice Stevens's constitutional majority opinion states, "in neither Witte nor Watts was there any contention that the sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the Sixth Amendment."  Booker, 543 US. at 240.  Justice Stevens further noted that Watts "presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause, and did not even have the benefit of full briefing or oral argument." Id. at 240 n.4 (citation omitted).

essential to sentencing have been determined by a judge rather than a jury . . . and also conclude that the fruits of the jury's efforts can be ignored with impunity by the judge in sentencing.")[4]; <u>United States v. Coleman</u>, 370 F. Supp. 2d 661, 668 (S.D. Ohio 2005) ("At sentencing, acquitted conduct should always be considered using a reasonable doubt standard; otherwise, a defendant's Sixth Amendment right to a jury trial is eviscerated."); <u>United States v. Huerta-Rodriguez</u>, 355 F. Supp. 2d 1019, 1028 (D. Neb. 2005) ("[T]he court finds that it can never be 'reasonable' to base any significant increase in a defendant's sentence on facts that have not been proved beyond a reasonable doubt."); <u>United States v. Gray</u>, 362 F. Supp. 2d 714, 720 (S.D. W. Va. 2005) (comparing the Guidelines advice against the beyond a reasonable doubt result, and rejecting the Guidelines advice if it greatly differs from the beyond a reasonable doubt result); <u>United States v. Carvajal</u>, No. 04 Cr.

---

[4] The court went on to say,

> [t]o consider acquitted conduct trivializes "legal guilt" or "legal innocence"—which is what a jury decides—in a way that is inconsistent with the tenor of the recent case law. . . . [W]hen a court considers acquitted conduct it is expressly considering facts that the jury verdict not only failed to authorize; it considers facts of which the jury expressly disapproved. . . . To tout the importance of the jury in deciding facts, even traditional sentencing facts, and then to ignore the fruits of its efforts makes no sense--as a matter of law or logic.

<u>Pimental</u>, 367 F. Supp. 2d at 152-53.

222 (AKH), 2005 U.S. Dist. LEXIS 3076, at *10-11 (S.D. N.Y. Feb. 17, 2005) ("I declined to accept the Government's argument that, notwithstanding the jury's verdict that Carvajal was not guilty of actually distributing crack, I should nevertheless consider that the acts necessary for completing the substantive crimes were proved by a preponderance of the evidence.").

The Fourth Circuit has held in an unpublished opinion that even after Booker, a district court should continue to use acquitted conduct when calculating a Guidelines sentencing range. United States v. Ashworth, 139 Fed. Appx. 525, 527 (4th Cir. 2005).  The Fourth Circuit did not directly address the constitutional issue posed by such a sentence and further did not address the question of whether the use of acquitted conduct contravenes the sentencing factors listed in 18 U.S.C. § 3553(a).

Are the Guidelines indeed sufficiently non-mandatory now so as to avoid the Sixth Amendment violation created by repudiating a jury's verdict on the core question of guilt or innocence? Justice Scalia forecast this issue in his dissent to the Booker remedy majority opinion when he asked:  "Will appellate review for 'unreasonableness' preserve de facto mandatory guidelines by discouraging district courts from sentencing outside the Guidelines ranges?"  Booker, 543 U.S. at 313 (Scalia, J., dissenting).

There is no question that a district judge sitting within the Fourth Circuit varies from a Guidelines sentence at his or her peril.  A Guidelines sentence is presumed reasonable.  United States v. Moreland, 437 F.3d 424, 433 (4th Cir. 2006).  A variance sentence, by contrast, is reviewed for both substantive and procedural error.  Id. at 434.  "[T]he farther the Court diverges from the advisory Guideline range the more compelling the reasons for the divergence must be."  Id.  Moreover, the district court's reason for imposing a variance sentence may not contravene the policies stated in the "advisory" Guidelines.  See, e.g., United States v. Hampton, 441 F.3d 284 (4th Cir. 2006) (vacating a downward variance sentence imposed principally out of concern for defendant's small children, noting that family ties are a discouraged factor under USSG § 5H1.6).

Discouragement, like beauty, lies in the eye of the beholder.  In the eyes of the Second Circuit, the Ninth Circuit, and certain dissenting judges, the presumption approach adopted by the Fourth Circuit renders the Guidelines de facto mandatory.  United States v. Forquet, No. 05-4013-cr, 2006 U.S. App. LEXIS 14224, at *3 (2d Cir. June 2, 2006); United States v. Zavala, 443 F.3d 1165, 1169-70 (9th Cir. 2006), vacated and consolidated for en banc review, 2006 U.S. App. LEXIS 21490[5]; United States v.

---

[5]Though Zavala was recently vacated pending en banc review, it is nevertheless a voice in the cacophony of post-Booker fallout.

Cage, 458 F.3d 537, 2006 U.S. App. LEXIS 20820, at *24-25 (6th
Cir. 2006) (Clay, J., dissenting); see also United States v.
Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)
("[A]lthough making the guidelines 'presumptive' or 'per se
reasonable' does not make them mandatory, it tends in that
direction . . . ."). To the Sixth, Eighth, and Tenth Circuits,
the presumption approach does not unduly discourage sentences
outside the Guidelines range. United States v. Kristl, 437 F.3d
1050, 1054 (10th Cir. 2006); United States v. Lewis, 436 F.3d
939, 946 (8th Cir. 2006); Cage, 458 F.3d 537. This Court did not
need to decide at the time of sentencing[6] whether the presumption
approach violates the Sixth Amendment by making the "advisory"
Guidelines de facto mandatory. The Court instead concluded that
basing defendant Ibanga's sentence on the crimes for which he was
acquitted would contravene the statutory factors set forth in 18
U.S.C. § 3553(a). See Clark v. Martinez, 543 U.S. 371, 381-82
(2005) (invoking the avoidance canon, which directs courts to
apply a statute in a way that avoids constitutional issues if
possible).

---

[6]Should the Fourth Circuit hold that a Guidelines sentence
based on acquitted conduct serves the sentencing factors set
forth in 18 U.S.C. § 3553(a), the constitutional issue would
become ripe.

B.          **Four-Step Sentencing Procedure**


After Booker, district courts in the Fourth Circuit must
follow a four-step process when sentencing a defendant.  First,
the court must calculate and consider the applicable Guidelines
range as required by 18 U.S.C. § 3553(a)(4).  United States v.
Hughes, 401 F.3d 540, 546 (4th Cir. 2005).   Second, the court
must consider the factors listed in 18 U.S.C. § 3553(a) and
determine whether the Guidelines sentence "serves" those factors.
Id.  If the Guidelines sentence does not serve the § 3553(a)
factors, the district court next should consider "whether a
departure is appropriate based on the Guidelines Manual or
relevant case law." Moreland, 437 F.3d at 432.  Finally, if
further adjustment still is needed to serve the § 3553(a)
factors, the Court may impose a variance sentence. Id.


1.   Consideration of the § 3553(a) Factors

Section 3553(a) states in pertinent part:

(a)   Factors to be considered in imposing a sentence.
      The court shall impose a sentence sufficient,
      but not greater than necessary, to comply with
      the purposes set forth in paragraph (2) of this
      subsection.   The court, in determining the
      particular  sentence  to  be  imposed,  shall
      consider—

      (1)   the nature and circumstances of the offense
            and the history and characteristics of the
            defendant;

> (2) the need for the sentence imposed—
>
>> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B)   to afford adequate deterrence to criminal conduct;
>>
>> (C)   to protect the public from further crimes of the defendant; and
>>
>> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . .
>
> (3) the kinds of sentences available;
>
> . . .
>
> (6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7)   the need to provide restitution to any victims of the offense.

(emphasis added).

Punishing defendant Ibanga for his acquitted conduct would have contravened the statutory goal of furthering respect for the law and would have resulted in unjust punishment for the offense for which he was convicted (i.e., money laundering).  18. U.S.C. § 3553(a)(2)(A).  From defendant Ibanga's perspective, a Guidelines sentence would certainly have resulted in confusion as to the law, and

18

confusion breeds contempt.  Defendant Ibanga is an immigrant to this country who has not had the benefit of extensive education, much less an intensive law school seminar on post-_Booker_ sentencing practices.  What could instill more confusion and disrespect than finding out that you will be sentenced to an extra ten years in prison for the alleged crimes of which you were acquitted?  The law would have gone from something venerable and respected to a farce and a sham.

From the public's perspective, most people would be shocked to find out that even United States citizens can be (and routinely are) punished for crimes of which they were acquitted.  See _Coleman_, 370 F. Supp. 2d at 671 n.14 ("A layperson would undoubtedly be revolted by the idea that, for example, a person's sentence for crimes of which he has been convicted may be multiplied fourfold by taking into account conduct of which he has been acquitted.") (internal quotations omitted).  In order to appreciate fully how corrosive this is to our system of government, one needs to review both the historical reasoning underlying the constitutional guarantee of trial by jury and the role that the jury system plays in civic affairs today.

a.   <u>Historic Role Of The Jury Trial</u>

The American criminal justice system is rooted in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." <u>In re Winship</u>, 397 U.S. 358, 372 (1970)(Harlan, J., concurring).  The jury is the principal guardian of this fundamental value.  The jury determines "legal guilt, guilt determined by the highest standard of proof we know, beyond a reasonable doubt.  And when a jury acquit[s] a defendant based on that standard, one . . . [expects] no additional criminal punishment would follow."  Judge Nancy Gertner, <u>Circumventing Juries, Undermining Justice: Lessons from Criminal Trials and Sentencing</u>, 32 Suffolk U. L. Rev. 419, 433 (1999).  Imposing a sentence that effectively nullifies a jury acquittal undermines the foundational principle of criminal law--to let a guilty man go free rather than convict an innocent man--and allows the judge to usurp the jury's historic role as the finder of fact.

Contravening a jury's verdict of guilt or innocence also undermines the careful political balance struck by the Founding Fathers.  The Founders' pivotal concern regarding the jury trial "was not fundamentally whether the lack of adequate provision for jury trial would weaken a traditional bulwark of

individual rights . . . but whether it would fatally weaken the role of the people in the administration of government." Akhil Reed Amar, The Bill of Rights as a Constitution, 100 Yale L.J. 1131, 1187 (1991) (quoting H. Storing, What the Anti-Federalists Were For 19 (1981) (footnote omitted)). Alexander Hamilton warned in The Federalist No. 83 that "arbitrary punishments upon arbitrary convictions have ever appeared to me to be the great engines of judicial despotism; and these have all relation to criminal proceedings." Madison's comment in the Philadelphia convention for the need "to preserve the State rights, as carefully as the trials by jury" illustrates the unquestioned role of the jury as a bulwark against despotism.  Amar, 100 Yale L.J. at 1186 (quoting 2 RECORDS OF THE FEDERAL CONVENTION of 1787, at 643-44 (M. Farrand rev. ed. 1937)).[7]

Every State constitution written between 1776 and 1787 unanimously guaranteed only one right:  the right of trial by jury in criminal cases.  Amar, 100 Yale L.J. at 1183.  The United States Constitution echoed its state predecessors by

---

[7]Tocqueville commented that the jury "invests the people, or the class of citizens, with the direction of society . . . The jury system as it is understood in America appears to me to be as direct and extreme a consequence of the sovereignty of the people as universal suffrage."  Amar, 100 Yale L.J. at 1185 (quoting A. De Tocqueville, Democracy in America 293-94 (Vintage ed. 1945)).

providing in Article III that, "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury." The Sixth Amendment subsequently specified that the jury was not "simply a popular body, but a local one," as the jury is drawn from "the State and district wherein the crime shall have been committed." Amar, 100 Yale L.J. at 1186. In judging the accused, the jury still functions as a "conduit for community conscience in culpability assessment." Barry L. Johnson, <u>If at First You Don't Succeed--Abolishing the Use of Acquitted Conduct in Guidelines Sentencing</u>, 75 N.C. L. Rev. 153, 185 (1997).

The jury is charged exclusively with deciding questions of fact, yet its fact-finding role is eviscerated by the Sentencing Guidelines' command that a district court enhance a defendant's sentence based on acquitted conduct. As Judge Gertner noted, "To tout the importance of the jury in deciding facts, even traditional sentencing facts, and then to ignore the fruits of its efforts makes no sense--as a matter of law or logic." <u>Pimental</u>, 367 F. Supp. 2d at 153. Such an approach effectively nullifies the jury verdict and prevents the jury from fulfilling its key role: "protect[ing] ordinary individuals against governmental overreaching." Amar, 100 Yale L.J. at 1183.

b.    Functions Of The Jury Trial


The jury as an institution not only guards against judicial despotism, but also provides an opportunity for lay citizens to become both pupils of and participants in our legal and political system.  Amar, 100 Yale L.J. at 1186; see also Johnson, 75 N.C. L. Rev. at 183-85.  Tocqueville commented that the jury "may be regarded as a gratuitous public school, ever open, in which every juror learns his rights."  Amar, 100 Yale L.J. at 1186.(quoting A. De Tocqueville, Democracy in America 295-96 (Vintage ed. 1945)).  Judges "[seize] the occasion to educate the jurors about legal and political values, ranging well beyond the narrow issues before them."  Id.

A sentence that repudiates the jury's verdict undermines the juror's role as both a pupil and participant in civic affairs.  The juror as pupil learns that the law does not value the results of his or her participation in the judicial process and may reject it at will.  The disparity in the sentencing ranges with and without the inclusion of acquitted conduct effectively "[drives] a wedge between the community's sense of appropriate punishment and the criminal sanction inflicted."  Johnson, 75 N.C. L. Rev. at 185.  To promote respect for the law and provide just punishment for the

offense, the jury's verdict, and not the Court's second guessing based on inadmissible evidence, must determine the upper limits of a sentence.  See Booker, 543 U.S. at 236.

Courts of Appeal highlight the distinction between a finding of guilt and the subsequent sentencing, and thereby justify the resulting distinction between the reasonable doubt standard and the preponderance standard.  This Court is fully aware of those distinctions, and while they make for interesting academic discussions, they are not real-world distinctions.  See Gray, 362 F. Supp. 2d at 723 ("Even though the defendant is already theoretically exposed to the maximum prison term allowed by statute, an erroneous factual determination regarding relevant conduct at sentencing will likely result in a longer period of incarceration than if the determination were not made.").  Any attempt to explain these distinctions to the public would simply feed the common complaint that the law is deliberately incomprehensible. People do not respect that which they cannot understand. Moreover, this Court is not at all convinced that the public would take comfort in knowing that a finding of guilt theoretically exposes the defendant to the statutory maximum. The statutory sentencing ranges are extremely wide for the very purpose of giving judges discretion in determining a penalty.  It is of little comfort to know that a defendant

24

theoretically could have gotten 20 years when, in practice, a court would have to repudiate the jury's verdict to impose such a sentence.

2.   Imposition of a Variance Sentence

    a.   Reasons for the Sentence

A variance sentence should not be based on only one of the statutory factors listed in section 3553(a).  United States v. Green, 436 F.3d 449, 457 (4th Cir. 2006).  In addition to concluding that a Guidelines sentence would not serve the factors of promoting respect for the law and providing just punishment for the offense, the Court considered the other statutory factors in deciding to vary from the Guidelines.

With respect to the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), this Court observed defendant Ibanga making great strides in his efforts to make amends for his actions and become a productive member of society.  He has become, according to persuasive third-party testimony, a devout Christian.  Upon being released pending sentencing, he excelled at a job and functioned as a model citizen.  His conduct allayed the Court's overarching concern

25

of protecting the public from future crimes of the defendant.
See 18 U.S.C. § 3553(a)(2)(c).

A Guidelines sentence would have brought defendant
Ibanga's progress to a screeching halt.  Having observed
defendant Ibanga, this Court had no doubt that being punished
for acquitted conduct would leave him with a "damned if you
do, damned if you don't" sense of despair.

With respect to the nature and circumstances of the
offense, 18 U.S.C. § 3553 (a)(1), defendant Ibanga was a bit
player in a much larger scheme that was managed by his father.
He aided in the laundering of a significant amount of money to
assist that drug distribution scheme, and for that he will
spend close to five years in federal prison.  But the jury
concluded that he was by no means a ringleader or even a
participant in the wholesale distribution of methamphetamine
"ice."  Nonetheless, a straight Guidelines sentence would have
punished him as if he were a major drug dealer.

After taking into account all of the statutory sentencing
factors, the Court concluded that a sentence of 55 months was
"sufficient" to reflect the seriousness of the offense and
provide just punishment.  18 U.S.C. § 3553(a)(2)(A).  Stated
differently, using the 151-188 month range would have resulted

in a sentence "greater than necessary" to punish defendant Ibanga for his actions.  18 U.S.C. § 3553(a).[8]

The Fourth Circuit has stated that "if the reasons justifying the variance are tied to § 3553(a) and are plausible, the sentence will be deemed reasonable."  Moreland, 437 F.3d at 434.  To say otherwise would "transform an effectively advisory system into an effectively mandatory one."  Id. at 433 (internal citations and quotations omitted).  Some say this evolution has already occurred, see United States v. Cage, 458 F.3d 537, 2006 U.S. App. LEXIS 20820, at *24-25 (6th Cir. 2006) (Clay, J., dissenting), but this Court treats consideration of the § 3553(a) factors as a meaningful exercise.

b.   Does Guideline Policy Preclude the Variance Sentence?

That the commentary to the Guidelines permits a court to consider acquitted conduct, USSG § 1B1.3, comment. (back'g.),

---

[8]That the Court's reasoning results in a "large" variance from the Guidelines calculation is of little consequence. See Moreland, 437 F.3d at 434 ("The farther the court diverges from the advisory guideline range, the more compelling the reasons for the divergence must be.").  The ten-year difference between the Guidelines sentence and the variance sentence reflects nothing more than the effect of including acquitted conduct as relevant conduct.  Much as a woman cannot be a little bit pregnant, a defendant cannot be a little bit acquitted.

does not preclude the Court from holding that such
consideration runs afoul of the statutory sentencing factors
set forth in 18 U.S.C. § 3553(a).  The Fourth Circuit has held
that a district court may not disregard Congress' judgment as
it is expressed in the Guidelines.  See United States v. Eura,
440 F.3d 625, 627, 632-33 (4th Cir. 2006) (holding that a
district court judge could not ignore the 100:1 crack to
powder cocaine disparity in the Guidelines using the § 3553(a)
factors).  The Eura court reasoned that Congress, through the
Guidelines, explicitly distinguished between cocaine base and
powdered cocaine and set the punishments accordingly.  USSG §
2D1.1(c).  As a result, the sentencing court may not disregard
the disparity simply because the court disagrees with the size
of the disparity.[9]  This reasoning is based upon the fact that
the 100:1 ratio is in the Guidelines themselves, which
Congress expressly approved.[10]

----

[9]However, in keeping with the advisory nature of the
Guidelines, the Eura court was constrained to caveat its
holding by saying "[o]f course, it does not follow that all
defendants convicted of crack cocaine offenses must receive a
sentence within the advisory sentencing range.  We certainly
envision instances in which some of the § 3553(a) factors
will warrant a variance from the advisory sentencing range in
a crack cocaine case."  Eura, 440 F.3d at 634.

[10]But see United States v. Gunter, No. 05-2952, 2006 U.S.
App. LEXIS 23143, at *27-28, *34 (3d Cir. Sept. 11, 2006).
The Gunter court ruled that although a sentencing court may
not categorically reject the 100:1 ratio, it may consider the
disparity when determining whether to vary downward as long as
the departure remains within the statutory minimum.  Thus, at

The same cannot be said of the instruction to consider acquitted conduct, which is implied in the background to the Sentencing Commission's commentary on the actual Relevant Conduct provision in the Guidelines.  USSG § 1B1.3, comment. (back'g.) ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range. . . . Relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach . . . .") (emphasis added).  Though this commentary is entitled to some deference, akin to that afforded to an administrative agency's interpretation of a statute, it is not dispositive.  Cf. Chevron U.S.A. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984) (requiring some deference, but not absolute deference, to an agency's interpretation of a statute).  Accordingly, when the commentary conflicts with the explicit word of Congress, the commentary must give way.  See id.  Such is the situation in the present case; the commentary directs a sentencing court to do something that would violate a statutory command.  18 U.S.C. § 3553(a).

---

least according to the Third Circuit, even the Guidelines themselves are one layer removed from an actual statute.  If this is so, the background to the commentary to the Guidelines must be even further removed.

## **CONCLUSION**

The Sentencing Guidelines have accomplished much good in the course of standardizing the sentencing process. Similarly, the Fourth Circuit's post-<u>Booker</u> presumption approach is a politically savvy parry to the thrust of those who call for more stringent measures, such as the expansion of mandatory minimums.  However, it is a charade to say that the Sixth Amendment violations inherent in the Guidelines are cured simply by intoning the word "advisory."  Saying something is so does not make it so.

One of Charles Dickens' characters, Mr. Bumble, famously observed, "If the law supposes that, . . . the law is an ass-- an idiot."  Charles Dickens, <u>Oliver Twist</u> 463 (3d ed. The New American Library 1961).  He was referring, of course, to a legal fiction that had no basis in reality.  Many of our fellow citizens believe that Mr. Bumble was right--that the legal process is rigged through sleights of hand that defy common sense.  It would only confirm the public's darkest suspicions to sentence a man to an extra ten years in prison for a crime that a jury found he did not commit.

The Clerk is **DIRECTED** to forward a copy of this Opinion to all counsel of record.

It is so **ORDERED**.


_____/s/_____
Walter D. Kelley, Jr.
UNITED STATES DISTRICT JUDGE


Norfolk, Virginia
October 5, 2006